[ORAL ARGUMENT NOT YET SCHEDULED]

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

_____

Consolidated Docket Nos. 13-1265, 13-1267, 13-1268
_____

MONROE ENERGY, LLC, *et al.,*

Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY,

Respondent.
_____

*On Petition for Review of Final Action of*
*the United States Environmental Protection Agency*
_____

**BRIEF OF PETITIONER MONROE ENERGY, LLC**
_____

David W. DeBruin
Marc A. Goldman
Matthew E. Price
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
Email: ddebruin@jenner.com
         mgoldman@jenner.com
         mprice@jenner.com

## CIRCUIT RULE 28 CERTIFICATE

1.     *Parties and Amici.*  Petitioners in these consolidated proceedings are Monroe Energy, LLC, American Petroleum Institute, and American Fuel & Petrochemical Manufacturers.   Intervenor in support of Petitioner is PBF Holding Company, LLC.  Respondent is U.S. Environmental Protection Agency.  National Biodiesel Board, Biotechnology Industry Organization, Growth Energy, and Renewable Fuels Association are Intervenors in support of Respondent.  There are no amici at this time.

2.     *Ruling Under Review.*  The ruling under review is EPA's final rule, entitled Regulation of Fuels and Fuel Additives: 2013 Renewable Fuel Standards, 78 Fed. Reg. 49,794 (Aug. 15, 2013), which can be found at JA790-827.[1]

3.     *Related Cases.*  Petitioner Monroe Energy, LLC is unaware of any related cases other than those that have already been consolidated.

---

[1] JA refers to the Joint Appendix.

i

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, Monroe Energy, LLC states that it is a refiner of petroleum products and is wholly owned by Delta Air Lines, Inc., a publicly traded company.  No publicly held company has a 10% or greater ownership of Delta Air Lines, Inc., stock.

## TABLE OF CONTENTS

CIRCUIT RULE 28 CERTIFICATE .................................................................. i

RULE 26.1 DISCLOSURE STATEMENT ....................................................... ii

TABLE OF AUTHORITIES ............................................................................ v

GLOSSARY .................................................................................................. viii

JURISDICTION ............................................................................................... 1

STATEMENT OF ISSUES .............................................................................. 1

STATUTES AND REGULATIONS ................................................................ 1

STATEMENT OF FACTS ............................................................................... 2

    A.   Statutory and Regulatory Framework ........................................ 2

    B.   The 2013 Rule ............................................................................ 7

SUMMARY OF ARGUMENT ...................................................................... 11

STANDING ................................................................................................... 13

ARGUMENT ................................................................................................. 13

    I.   Standard of Review .................................................................... 13

    II.   The 2013 Rule's Total Renewable Fuel Requirement Is Arbitrary And Capricious ............................................................. 14

        A.   Requiring The Use Of More Renewable Fuel Than The Economy Can Absorb Serves No Statutory Purpose, But Imposes Substantial And Disproportionate Costs ............................. 14

        B.   EPA Had Discretion To Impose A Lower Total Renewable Fuel Requirement ................................................................ 21

    III.   The 2013 Rule Must Be Vacated Due To EPA's Extreme Tardiness In Issuing It ................................................................. 23

CONCLUSION .............................................................................................. 26

iii

RULE 32(a)(7) CERTIFICATE ...............................................................................27

CERTIFICATE OF SERVICE .................................................................................28

# TABLE OF AUTHORITIES[*]

CASES

*American Farm Bureau Federation v. EPA*, 559 F.3d 512 (D.C. Cir. 2009) .........17

*\*American Petroleum Institute v. EPA*, 706 F.3d 474 (D.C. Cir. 2013) ........3, 9, 17, 19, 20, 21

*\*Chemical Manufacturers Ass'n v. EPA*, 217 F.3d 861 (D.C. Cir. 2000).........12, 20

*Continental Air Lines, Inc. v. Department of Transportation*, 843 F.2d 1444 (D.C. Cir. 1988) ...................................................................................20

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ....................................21

*\*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)....................................18

*National Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130 (D.C. Cir. 2002) ...................................................................................................13

*National Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145 (D.C. Cir. 2010) ...................................................................................................24

*National Shooting Sports Foundation, Inc. v. Jones*, 716 F.3d 200 (D.C. Cir. 2013) ...........................................................................................13, 14, 15

*Sierra Club v. Whitman*, 285 F.3d 63 (D.C. Cir. 2002)..........................................23

STATUTES AND REGULATIONS

42 U.S.C. §7524(b) ................................................................................................17

42 U.S.C. §7545(o) ..................................................................................................2

42 U.S.C. §7545(o)(2)(A) ........................................................................................2

42 U.S.C. §7545(o)(2)(B)(i)(I) .................................................................................2

42 U.S.C. §7545(o)(2)(B)(i)(III)..............................................................................21

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

42 U.S.C. §7545(o)(3)(A) .................................................................25

42 U.S.C. §7545(o)(3)(B)(i) ..........................................................3, 23

42 U.S.C. §7545(o)(3)(B)(ii)(I) ..............................................3, 11, 22

42 U.S.C. §7545(o)(3)(B)(ii)(II) .......................................................3

42 U.S.C. §7545(o)(3)(B)(ii)(III) ......................................................3

42 U.S.C. §7545(o)(5) ................................................................. 4-5

42 U.S.C. §7545(o)(7)(A)(ii) .......................................................3, 22

42 U.S.C. §7545(o)(7)(D)(i) ..............................................3, 21, 22

42 U.S.C. §7607(b)(1) .......................................................................1

42 U.S.C. §7607(d)(9) .....................................................................13

40 C.F.R. §80.1405(a)(4)(iv) .............................................................7

40 C.F.R. §80.1405(c) ........................................................................3

40 C.F.R. §80.1406(a) ........................................................................4

40 C.F.R. §80.1406(a)(1) .................................................................13

40 C.F.R. §80.1425 .............................................................................4

40 C.F.R. §80.1426 .............................................................................4

40 C.F.R. §80.1427 .............................................................................4

40 C.F.R. §80.1427(a)(1) ..............................................................6, 15

40 C.F.R. §80.1427(a)(5) ..............................................................6, 15

40 C.F.R. §80.1428 .............................................................................4

40 C.F.R. §80.1429 .............................................................................4

**OTHER AUTHORITIES**

*EPA, Regulation of Fuels and Fuel Additives: Renewable Fuel Standard
   Program, 72 Fed. Reg. 23,900 (May 1, 2007) ("2007 Rule") .................2, 4, 5, 6,
                                                                           11, 20, 21, 22

*EPA, Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel
   Standard Program, 75 Fed. Reg. 14,670 (Mar. 26, 2010) ("2010 Rule") ...4, 5, 7,
                                                                           10, 18, 23

EPA, 2014 Standards for the Renewable Fuel Standard Program, 78 Fed.
   Reg. 71,732 (Nov. 29, 2013) ("2014 NPRM").......................................15, 16, 22

# GLOSSARY

| | |
|---|---|
| AFPM | American Fuel & Petrochemical Manufacturers |
| API | American Petroleum Institute |
| EPA | Environmental Protection Agency |
| E10 | A finished gasoline blend containing up to 10% ethanol |
| NPRM | Notice of Proposed Rulemaking |
| RFS | Renewable Fuel Standard |
| RFS1 | Initial RFS program implementing the Energy Policy Act of 2005, Pub. L. No. 109-58 §1501, 119 Stat. 594. |
| RFS2 | Revised RFS program implementing the Energy Independent and Security Act of 2007, Pub. L. No. 110-140 §§201-202, 121 Stat. 1492. |
| RIN | Renewable Identification Number |
| 2007 Rule | EPA, Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program, 72 Fed. Reg. 23,900(May 1, 2007). |
| 2010 Rule | EPA, Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program, 75 Fed. Reg. 14,670 (Mar. 26, 2010). |
| 2013 Rule | EPA, Regulation of Fuels and Fuel Additives: 2013 Renewable Fuel Standards, 78 Fed. Reg. 49,794 (Aug. 15, 2013). |
| 2014 NPRM | EPA, 2014 Standards for the Renewable Fuel Standard Program, 78 Fed. Reg. 71,732 (Nov. 29, 2013). |

## JURISDICTION

This Court has jurisdiction under 42 U.S.C. §7607(b)(1) to review a final rule of the Environmental Protection Agency ("EPA") entitled Regulation of Fuels and Fuel Additives: 2013 Renewable Fuel Standards, 78 Fed. Reg. 49,794 (Aug. 15, 2013) ("2013 Rule").  Petitioner Monroe Energy, LLC ("Monroe") filed a timely petition for review on October 4, 2013.  Monroe promptly moved to expedite review to allow a ruling by April 30, 2014, to allow Monroe and other parties time to comply following this Court's decision, but in advance of the June 30, 2014 compliance deadline.  The Court ordered an expedited schedule.

## STATEMENT OF ISSUES

1.      Whether the 2013 Rule was arbitrary and capricious in requiring the blending of more renewable fuel into transportation fuel than the economy can consume, and thus requiring obligated parties to submit more compliance credits for 2013 (known as "Renewable Identification Numbers" or "RINs") than could be created in 2013.

2.      Whether the 2013 Rule was arbitrary and capricious because, without adequate justification, it was promulgated nearly nine months after the statutory deadline.

## STATUTES AND REGULATIONS

The attached Addendum includes the statute and regulations at issue.

1

## STATEMENT OF FACTS

### A.     Statutory and Regulatory Framework.

The Renewable Fuel Standard ("RFS"), enacted in 2005 ("RFS1") and
expanded in 2007 ("RFS2"), requires renewable fuel to be blended into
transportation fuel.  *See* 42 U.S.C. §7545(o).  "Given the ever-increasing demand
for petroleum-based products in the transportation sector," Congress intended to
"replac[e] part of this demand with renewable energy," by "provid[ing] some
certainty for investment in production capacity of renewable fuels."  EPA,
Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program, 72
Fed. Reg. 23,900, 23,902-03 (May 1, 2007) ("2007 Rule").  Therefore, Congress
mandated that certain quantities of renewable fuel be used each year, in amounts
that increase over time.  42 U.S.C. §7545(o)(2)(B)(i)(I).  For example, in 2013,
transportation fuel sold or introduced into commerce in the United States must
contain at least 16.55 billion gallons of renewable fuel.  *Id.*

EPA must issue annual regulations to ensure that the "transportation fuel
sold or introduced into commerce in the United States … on an annual average
basis" contains at least the amount of renewable fuel specified by Congress.  *Id.*
§7545(o)(2)(A).  EPA takes the amount of renewable fuel required to be used in
the coming year, and divides by the total amount of non-renewable transportation
fuel projected to be sold in the United States that year.  This results in a "volume

2

percentage requirement" that is imposed on obligated parties. *Id.*
§7545(o)(3)(B)(i), (ii)(II)-(III); 40 C.F.R. §80.1405(c). For example, if 5 million
gallons of renewable fuel must be used, and 100 million gallons of non-renewable
transportation fuel is projected to be used, EPA would impose a 5% volume
percentage requirement. An obligated party would then be required to
demonstrate that five gallons of renewable fuel have been used for every 100
gallons of non-renewable transportation fuel it sells in the United States.

Congress provided EPA with flexibility, under certain circumstances, to
reduce the statutory volume requirements, resulting in a corresponding reduction in
the volume percentage requirements. *See* 2013 Rule at 49,823. For example, EPA
may reduce the overall requirement for renewable fuel when there is an
"inadequate domestic supply," 42 U.S.C. §7545(o)(7)(A)(ii), or when the
production of "cellulosic biofuel" – fuel manufactured from materials like corn
husks – falls short of Congress's expectations, as it did in 2013. *See id.*
§7545(o)(7)(D)(i); *Am. Petroleum Inst. v. EPA*, 706 F.3d 474, 476 (D.C. Cir. 2013)
*("API")*.

**Obligated Parties And The Credit System.** EPA has discretion to impose
the RFS obligation on "refineries, blenders, and importers, as appropriate." 42
U.S.C. §7545(o)(3)(B)(ii)(I). Refiners produce (and importers import) petroleum
"blendstock." Companies called "blenders" then blend renewable fuel into the

3

petroleum blendstock in order to produce the finished transportation fuel that is ultimately sold to consumers. As EPA has recognized, refiners and importers "do not generally produce or blend renewable fuels at their facilities." 2007 Rule at 23,937; *see also* EPA, Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program, 75 Fed. Reg. 14,670, 14,721 (Mar. 26, 2010) ("2010 Rule"). Nonetheless, EPA has chosen to impose the compliance obligation on refiners and importers of petroleum, and not on blenders. 40 C.F.R. §80.1406(a).

To comply, refiners and importers must acquire and submit transferrable credits called "RINs." These transferable credits are generated when blenders mix renewable fuels with petroleum blendstock to form finished fuel. That blending typically occurs close to the ultimate point of sale, because blended fuel cannot be transported in pipelines. Each RIN represents a blender's use of one gallon of renewable fuel. Refiners and importers can acquire the RINs directly from a blender or from anyone to whom a blender has sold the RINs. *See generally* 40 C.F.R. §§80.1425–80.1429. Under this system, "the actions needed for compliance largely center on the production, distribution, and use of a product by parties other than refiners and importers." 2007 Rule at 23,937.

**Purpose Of The Credit System.** EPA established RINs pursuant to a statutory mandate to use credits as the compliance mechanism. 42 U.S.C.

4

§7545(o)(5).  One purpose of the credit system is to ensure that compliance is efficient and competitively neutral.  As EPA has noted, some entities "will have easier access to renewable fuels than others."  2007 Rule at 23,910.  For example, some refiners, known as "integrated refiners," also operate as blenders or are affiliated with blenders.  These refiners can obtain RINs from their affiliated blenders.  Other refiners operate as "independent refiners," unaffiliated with any blender.  These refiners acquire their RINs in the market.

EPA intended the credit system to allow all obligated parties to comply on an equal footing.  EPA explained:  "Many obligated parties do not have access to renewable fuels or the ability to blend them, and so must use credits to comply…. [T]rading mechanisms … ensure that the means to demonstrate compliance will be readily available for use by obligated parties."  *Id.* at 23,904.  The RFS program thus "provid[es] the flexibility for each obligated party to use renewable fuel in the most economical ways possible."  *Id.* at 23,908

If the RIN system works as intended, the cost of a RIN should reflect the cost of renewable fuel relative to the petroleum it replaces.  2010 Rule at 14,670, 14,722; *see also* JA62.  All refiners would then face approximately the same compliance costs, whether they themselves blend renewable fuel or instead rely on others.  For an integrated refiner or blender, the cost of creating a RIN will equal the marginal cost of blending a gallon of renewable fuel in place of petroleum.

5

Thus, if ethanol costs 10¢ more per gallon than petroleum, the cost of generating a RIN will be 10¢. An independent refiner should be able to purchase a RIN from a blender for approximately the same cost. The RIN system thus "allows the renewable fuels market to continue operating according to natural market forces, avoiding the possibility that every single refiner would need to purchase renewable fuel for blending into its own gasoline." 2007 Rule at 23,933.

When ethanol is *less* expensive than petroleum blendstock, blenders will use as much ethanol as they can, and RINs will be created as a byproduct of a blending process that would have occurred regardless of the RFS mandate. *See* JA424, 432-34. That has been the case for corn-based ethanol for much of the time since the RFS program was enacted. Blenders generated an oversupply of RINs without any additional cost to themselves, and independent refiners could purchase RINs for almost nothing. *See id.*

**Banking Of RINs.** Under EPA's rules, some RINs can be "banked" or "carried over" for use in the year following the one in which they were created, providing parties with "some flexibility in the event of market disruptions." 2007 Rule at 23,935. Each year, a party can satisfy up to 20% of its obligations using RINs banked from the prior year. 40 C.F.R. §§80.1427(a)(1), (5).

To hedge against future uncertainty, obligated parties with access to RINs have an incentive to bank some of their excess RINs rather than selling them to

6

other obligated parties who may need them now.  For example, banked RINs

protect against the risk that drought or other factors will cause an increase in

ethanol prices (and thus RIN prices).  As EPA has noted, "obligated parties who

have excess RINs have been observed to retain rather than sell them to ensure they

have a sufficient number for the next year's compliance.  This was most likely to

occur with major integrated refiners."  2010 Rule at 14,722.  As a result of

banking, independent refiners without "direct access to RINs … could potentially

find it difficult to acquire a sufficient number for compliance despite the fact that

the total nationwide volume of renewable fuel meets or exceeds the standard.  The

result might be a higher price for RINs (and fuel) in the marketplace than would be

expected under a more liquid RIN market."  *Id.*  Until this year, that potential

scenario had never been realized, because blenders were producing so many excess

RINs that, even after integrated refiners banked all the RINs they could, there were

still many more RINs available for purchase.

### B.    The 2013 Rule.

For 2013, EPA established a volume percentage requirement, 40 C.F.R.

§80.1405(a)(4)(iv), in circumstances it had never previously faced:  the economy

could not absorb the volume of renewable fuel set forth in the statute due to a

technological limit on ethanol usage known as the "E10 blendwall."  The

blendwall exists because the overwhelming majority of  automobile engines in this

7

country cannot consume gasoline containing more than 10 percent ethanol (a blend known as E10) without having their warranties voided. *See* JA63, 68, 454.

When Congress enacted the statute, it did not anticipate that the blendwall would be reached. Congress expected that total gasoline consumption in the United States would continue to increase, even as the RFS program required increasing consumption of renewable fuels. However, the economic recession and greater fuel efficiency have led to declining gasoline consumption. Thus, in 2007, gasoline consumption was projected to rise to 150 billion gallons by 2013, *see* JA456; but the 2013 Rule projected that only 133 billion gallons of gasoline would be consumed in 2013. 2013 Rule at 49,826.

The combination of declining gasoline consumption and increasing statutory volume requirements has led the economy to hit the E10 blendwall. The 2013 statutory volume requirements necessitate the use of 14.5 billion gallons of ethanol. *Id.* at 49,822. Yet the maximum amount of ethanol that could be used in E10 fuel was only 13.1 billion gallons. *Id.* In other words, the statute required the use of 1.4 billion gallons more ethanol in 2013 than blenders could use in producing E10. Thus, obligated parties would be required to submit 1.4 billion *more* RINs than blenders would be capable of creating in 2013 when making E10. *Id.* ("[W]e note that the 14.5 bill gal of ethanol that might need to be consumed in 2013 … is … 1.4 bill gal above the E10 blendwall.").

8

EPA acknowledged that it had discretion to consider multiple policy factors, including the effects of the blendwall, in deciding whether to reduce the volume requirement below that set forth in the statute. *Id*. at 49,810-12. It specifically requested comments concerning the blendwall. JA35. Ultimately, it chose not to exercise its discretion, based entirely on its conclusion that compliance was possible despite the blendwall. *See* 2013 Rule at 49,821-22.

In finding compliance possible, EPA principally pointed to the existence of banked 2012 RINs that could supplement RINs created during 2013. *See id.* But in relying on RINs banked from 2012, EPA made no attempt to accommodate for the fact that parties could bank an even larger number of RINs created in 2013 for potential use in 2014. *Id.* at 49,821-23. Obligated parties had a strong incentive to bank as many RINs as they could for 2014, because the 2014 statutory requirements increase further. Although EPA pledged to reduce those statutory requirements to a "reasonably attainable" level*, id*. at 49,823, EPA has a track record of overestimating the economy's ability to produce and consume renewable fuels. *See*, *e.g.*, *API*, 706 F.3d at 479 (reversing EPA for aspirational projections of renewable fuel usage). Thus, in addition to the usual reasons for banking RINs – like hedging against the risk of a poor corn crop – parties with RINs also sought to hedge against regulatory uncertainty and the risk of unattainable compliance obligations in 2014.

As a result of the strong incentive for obligated parties with access to extra 2013 RINs to bank those RINs, many fewer 2013 RINs were available for purchase on the secondary market than EPA assumed – and, in tandem with that scarcity, RIN prices dramatically increased and have since exhibited extreme volatility.  These market dynamics were triggered by EPA's public release of its 2013 Notice of Proposed Rulemaking ("NPRM") in January 2013.  Even though ethanol remained cheaper than blendstock, *see* JA432-34, meaning that there was no marginal cost to generating a RIN and that RIN prices should have been near zero, *see supra* at 5-6, RIN prices spiked from approximately 5¢ per RIN in early January 2013 to approximately 70¢ by March 2013, and increased further after the comment period closed.  2013 Rule at 49,822 & n.73; JA424-25, 427-28.  RIN prices have since fallen from their peak, but remain much higher than their historical price of 2-5¢; are disconnected from the relative prices of ethanol and petroleum blendstock; and have continued to exhibit significant volatility, increasing in recent weeks from 19¢ to 37¢.

EPA previously had stated that such price volatility would be evidence "that the RIN market is not operating as intended."  2010 Rule at 14,722.  The credit system no longer allows obligated parties to comply on an equal footing.  *See* JA52-53, 67-68, 428, 485-86, 671-72, 683, 756-57.  Independent refiners like Monroe, who must acquire RINs on the market, have seen their costs soar.  A mid-

size independent refiner could be forced to spend tens of millions of dollars in additional compliance costs for 2013 alone. Competing integrated refiners will not incur those compliance costs because they can obtain RINs from their affiliated blenders. And, because ethanol remains cheaper than petroleum blendstock, blenders reap windfall profits from the sale of RINs that they would have created anyway. Under these circumstances, far from allowing "natural market forces" to govern, 2007 Rule at 23,933, the RIN program perversely penalizes independent refiners for market conditions that they are powerless to change.

The adverse effects of the 2013 Rule were aggravated by EPA's extreme tardiness. It was promulgated on August 15, 2013 – nearly nine months after the statutory deadline of November 30, 2012. 42 U.S.C. §7545(o)(3)(B)(i). As a result, market participants could not make informed decisions that would have affected the size of their compliance obligation, as discussed below.

## SUMMARY OF ARGUMENT

In the 2013 Rule, EPA has required Monroe and other refiners to demonstrate, through the submission of RINs, that blenders have blended a greater volume of renewable fuel into the refiners' petroleum products than blenders either can or will actually blend, due to the E10 blendwall. EPA identified no statutory purpose that would be served by such a requirement. It cannot promote the use of

more ethanol, because the entire problem is that the economy cannot consume any more ethanol in 2013.

EPA had discretion to reduce the volume requirements, but it refused to exercise that discretion. Instead, EPA justified its requirement solely on the ground that compliance was possible through the use of RINs created in 2012 and banked for potential use in 2013. But EPA irrationally failed to account for the fact that some RINs created in 2013 will be banked for use in 2014. The resulting scarcity in RINs available for compliance in 2013 has caused volatile RIN prices that bear no connection to the relative prices of ethanol and petroleum and that uniquely penalize independent refiners. Despite evidence that the NPRM had already triggered that dynamic – RIN prices shot up fourteen-fold between January and March 2013 – EPA failed to account for it when setting its volume percentage requirements. It is arbitrary and capricious for EPA to impose a compliance obligation that advances no statutory purpose, yet imposes significant and disproportionate costs on one sector of the regulated industry. *See, e.g.*, *Chem. Mfrs. Ass'n v. EPA*, 217 F.3d 861, 866-67 (D.C. Cir. 2000).

The consequences of EPA's irrational rule are aggravated by EPA's gross tardiness in issuing the 2013 Rule. EPA found that the rule's late issuance caused no harm, because parties "do not need lead time" in order to comply; they can merely purchase RINs once the compliance obligation becomes known. 2013 Rule

12

at 49,800.  However, if EPA had released the rule on time, parties could have altered the extent of their compliance obligation by adjusting their production or choosing to export.

## STANDING

As a refiner, Monroe is obligated under the 2013 Rule to submit RINs to satisfy EPA's volume percentage requirement.  40 C.F.R. §80.1406(a)(1); JA683. Therefore, Monroe has suffered an injury in fact traceable to the 2013 Rule, that can be remedied by the vacatur Monroe requests, and that is within the zone of interests to be regulated by the rule.  *See Nat'l Petrochem. & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1147-48 (D.C. Cir. 2002).

## ARGUMENT

## I.    Standard Of Review.

This Court may vacate the 2013 Rule if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  42 U.S.C. §7607(d)(9). The Court must uphold factual determinations supported by substantial evidence, but does "not defer to an agency's conclusory or unsupported suppositions."  *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (internal quotation marks omitted).  The Court "may not uphold agency action based on speculation" or one unsupported by a "satisfactory explanation … including a

13

rational connection between the facts found and the choice made." *Id.* (internal

quotation marks omitted).

## II.    The 2013 Rule's Total Renewable Fuel Requirement Is Arbitrary And Capricious.

### A.    Requiring The Use Of More Renewable Fuel Than The Economy Can Absorb Serves No Statutory Purpose, But Imposes Substantial And Disproportionate Costs.

The 2013 Rule absurdly requires refiners to acquire RINs demonstrating that

blenders have blended more than a billion gallons of ethanol in excess of what the

economy is actually capable of absorbing. *See* 2013 Rule at 49,822

(acknowledging that "the 14.5 bill gal of ethanol that might need to be consumed

in 2013 … is … 1.4 bill gal above the E10 blendwall.").

EPA had discretion to reduce the statutory volume requirement, *see infra* at

21-23, and it did not identify any statutory purpose served by requiring refiners to

demonstrate that blenders have blended more ethanol than they can or will blend.

Such a requirement cannot promote the greater use of ethanol in blending finished

fuel, because the overwhelming number of automobile engines cannot use higher

ethanol blends.  Moreover, because ethanol remains cheaper than petroleum,

blenders will use as much ethanol as they can regardless of any requirement.

Rather than demonstrate that its rule served any statutory purpose, EPA

instead justified it on the ground that compliance was feasible.  2013 Rule at

49,821-22.  EPA principally relied on its conclusion that "there are over 2.6 bill

14

carryover RINs available," which would "permit compliance" with the 2013

requirements, so long as 1.4 billion of those RINs are made available for sale.  *Id.*;

*id.* at 49,821 ("In the absence of carryover RINs from 2012, it would be extremely

challenging to meet this standard.").[2]  For several reasons, however, that is not a

"satisfactory explanation" for imposing the obligation.  *Jones*, 716 F.3d. at 214

(quotation marks omitted).

    First, EPA's own analysis showed that compliance might *not* be possible for

all parties in 2013.  While EPA determined that 2.6 billion RINs have been carried

over from 2012 into 2013, 2013 Rule at 49,821-22, an even greater number of

RINs – at least  *three billion* – can be carried over from 2013 to 2014.[3]  If parties

---

[2] EPA also pointed to possible use of "E85," a gasoline blend containing a high percentage of ethanol that can be used by very few vehicles.  2013 Rule at 49,821.  EPA acknowledged that 2.1 *billion* gallons of E85 would be needed to fill the gap caused by the E10 blendwall, yet only 40 *million* gallons had been used in 2012.  *Id.*; *id.* at 49,823.  EPA also acknowledged that "the ability of the market to consume ethanol in higher blends such as E85 is constrained as a result of infrastructure- and market-related factors," *id.* at 49,823, such as the "adequate availability of infrastructure for distribution of E85, availability of [flexible fuel vehicles], [and] consumer awareness of the availability of E85."  *Id.* at 49,821; *see also* JA65, 458-59, 487-88.  Given these limitations, EPA did not find, and could not find, that E85 usage could allow the economy to overcome the E10 blendwall.

[3] Parties may use RINs generated in 2013 to meet 20% of their 2014 obligations.  Twenty percent of the statutory obligation for 2014 equals 3.6 billion RINs.  *See* 40 C.F.R. §80.1427(a)(1), (5).  Although EPA recently proposed reducing the 2014 obligation below the statutory obligation, 20% of its proposed obligation is still more than 3 billion RINs.  *See* 2014 Standards for the Renewable Fuel Standard Program, 78 Fed. Reg. 71,732, 71,770 (Nov. 29, 2013) ("2014 NPRM").

bank for 2014 all the RINs they are able to bank, rather than selling them to parties

who need them to comply in 2013, the market will be 1.8 billion RINs short of

what is needed for parties to comply in 2013, even after counting every banked

2012 RIN.[4]  And parties have strong incentives to bank as many RINs for 2014 as

they can.  Statutory obligations are even higher in 2014 than they are in 2013.

While EPA committed to reduce the 2014 obligations to a "reasonably attainable"

level, *id.* at 49,823, that vague promise cannot provide obligated parties assurance

that EPA will leave sufficient headroom in the event that the agency's projections

turn out to be incorrect.[5]  Banking RINs provides a hedge against this regulatory

uncertainty, as well as against other types of uncertainty.

EPA acknowledged the strong incentive for parties with access to RINs to

bank them for use in 2014.  Yet it bizarrely neglected to account for that incentive

in concluding that compliance would be possible for all parties in 2013.  For

example, EPA noted "indications from some stakeholders that those who own

---

[4] EPA calculated that the market would produce 1.4 billion fewer RINs in 2013 than were required for compliance.  2013 Rule at 49,821-22.  If an additional 3 billion RINs are carried over into 2014, then even after accounting for the 2.6 billion 2012 RINs that have been banked, the market will be 1.8 billion RINs short in 2013.

[5] EPA's recently published 2014 NPRM proposes to reduce the 2014 statutory volumes, 2014 NPRM at 71,770, but it remains just a proposal and does not fully resolve the problem of future scarcity.  RIN prices have continued to be volatile and significantly above historical levels.

carryover RINs may opt to not sell them, instead carrying them over to help assure

compliance with their own obligations in a future year." 2013 Rule at 49,822.  It

admitted "[t]here is no way to determine what fraction of carryover RINs may" be

hoarded rather than sold.  *Id.*  And it even conceded that "in some cases carryover

RINs from 2012 may not be available to an individual obligated party that needs

them."  *Id.*; *see also* JA455, 672.

EPA did not explain how these concessions could possibly be squared with

its assertion that "there will be sufficient RINs available to obligated parties to

satisfy their … obligations in 2013 despite the challenge represented by the

blendwall." 2013 Rule at 49,822.  EPA's "failure adequately to consider a relevant

and significant aspect of a problem" renders the 2013 Rule "arbitrary and

capricious."  *Am. Farm Bureau Federation v. EPA*, 559 F.3d 512, 520 (D.C. Cir.

2009).  The RFS are not intended to subject obligated parties to potentially massive

penalties, *see* 42 U.S.C. §7524(b), for failing to comply with obligations they

cannot meet.  *Cf. API*, 706 F.3d at 479 (recognizing that, in passing §7545(o),

Congress did not intend to put obligated parties "in an impossible position, or at

least a highly punitive one" in which they face penalties due to structural

conditions beyond their control).

Second, even if compliance were feasible, EPA failed to consider the

implications of a fourteen-fold increase in RIN prices between January 2013 and

March 2013 for the proper functioning of its RIN market. EPA acknowledged that RIN prices increased "from approximately 5¢/RIN in early January 2013 to approximately 70¢/RIN by March 2013," 2013 Rule at 49,822 – and then "continued to rise after the comment period … closed." *Id.* at 49,822 n.73. It also acknowledged that "the primary driver for these price increases" was "the approaching E10 blendwall and the related anticipation of future scarcity of RINs." *Id.* at 49,822. But it failed to consider the implications of that price spike for the RIN market – despite having previously stated that spiking RIN prices would be evidence "that the RIN market is not operating as intended." 2010 Rule at 14,722. It is arbitrary and capricious for EPA to have dismissed, without any serious analysis, a fourteen-fold increase in the price of compliance over two months. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has … entirely failed to consider an important aspect of the problem.").

In particular, EPA's failure to consider the disproportionate and severe impact of these high RIN prices for one segment of refiners was arbitrary and capricious. The burden of high and volatile RIN prices falls disproportionately on independent refiners who must acquire their RINs on the secondary market, and who therefore must pay these high and unpredictable prices for every RIN they need. Integrated refiners, by contrast, can obtain RINs from affiliated blenders.

18

*See* JA428, 485-86, 671-72, 683, 756-57.  The Department of Energy had

previously noted the possibility of such "disproportionate" effects near the

blendwall, JA52-53, explaining that parties that "cannot generate enough RINs

through their own facilities to meet their [obligations] … could suffer significant

economic hardship."  JA67-68.

Monroe told EPA that precisely this dynamic was underway, stating that

because "Monroe has no blending capabilities and must purchase 100% of its RINs

for compliance[,] … the extreme price spike in the price of RINs is causing a

disproportionate economic impact on Monroe for which no relief is available."

JA683.  Monroe thus faced tens of millions of dollars in compliance costs that

integrated refiners did not face.  Other independent refiners reported the same

disproportionate impact.  *See* JA485-86, 671-72, 756-57.  In response, EPA merely

noted that "high RIN prices may impact individual fuel market participants

differently,"  2013 Rule at 49,822.  But it did not explain why it was rational to

impose such a disproportionate regulatory burden on one segment of refiners,

particularly when independent refiners "are in no position to ensure, or even

contribute to, growth" in the use of renewable fuels by blenders.  *API*, 706 F.3d at

480.

This Court has previously held that it is arbitrary and capricious for EPA "to

impose costly obligations on regulated entities without regard to the Clean Air

19

Act's purpose." *Chem. Mfrs. Ass'n*, 217 F.3d at 867; *see also Cont'l Air Lines, Inc. v. Dep't of Transp.*, 843 F.2d 1444, 1452 (D.C. Cir. 1988) ("the critical point is whether the agency has advanced what the *Chevron* Court called a reasonable explanation for its conclusion that the regulations serve the … objectives [in question]." (alteration in original; internal quotation marks omitted)).  The same conclusion applies here: EPA failed to identify any statutory purpose served by requiring refiners to procure banked RINs to comply with an otherwise unattainable obligation.  Yet the cost of that obligation is significant and falls disproportionately on independent refiners, who are not themselves in a position to increase renewable fuel usage.  *See API*, 706 F.3d at 480 (criticizing regulatory scheme that "applies the pressure to one industry (the refiners)" when "it is another … that enjoys the requisite expertise, plant, capital and ultimate opportunity for profit.").

Finally, EPA failed to consider that the disproportionate impacts of the 2013 Rule are *contrary* to the purpose of the credit system established by Congress. That system is intended to "preserv[e] the natural market forces and blending practices that will keep renewable fuel costs to a minimum," 2007 Rule at 23,929, and to allow "current blending practices to continue wherein some refiners purchase a significant amount of renewable fuel for blending into their gasoline

while others do little or none." *Id.* It thus "provid[es] a means for all refiners to economically comply with the standard." *Id.* at 23,929-30.

Far from "preserv[ing] … natural market forces," *id.* at 23,929, the 2013 Rule overrides those forces by requiring ethanol to be used in quantities that the market cannot bear, and distorts the competitive playing field against independent refiners, who have no means to "economically comply with the standard" that EPA has imposed. *Id.* at 23,930. EPA's failure to reconcile the 2013 Rule with its own prior explanation of the premises underlying the credit system is yet another reason that the rule is arbitrary and capricious. Agencies "may not ... depart from a prior policy *sub silentio*." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

## B.  EPA Had Discretion To Impose A Lower Total Renewable Fuel Requirement.

The 2013 Rule cannot be justified on the ground that the agency had no choice but to implement Congress's directive. To the contrary, EPA had substantial discretion to adjust the statutory volume requirements downward.

First, EPA enjoys discretion to reduce the total renewable fuel requirement when the production of cellulosic biofuel falls short of Congress's expectations. *See* 42 U.S.C. §7545(o)(7)(D)(i); *API*, 706 F.3d at 476. Although the statute calls for the consumption of one *billion* gallons of cellulosic biofuel in 2013, *see* 42 U.S.C. §7545(o)(2)(B)(i)(III), EPA determined that only 6 *million* gallons of

21

cellulosic biofuel would be produced this year.  2013 Rule at 49,798.  Thus, under

§7545(o)(7)(D)(i), EPA had discretion to reduce the total renewable fuel

requirement by 994 million gallons, which would have largely eliminated the E10

blendwall problem.  Yet EPA chose not to exercise that discretion.  *See* 2013 Rule

at 49,810.

Second, EPA has authority to reduce national volume requirements "based

on a determination by the Administrator … that there is an inadequate domestic

supply."  42 U.S.C. §7545(o)(7)(A)(ii).  EPA suggested that "the statute provides

EPA with the authorities and tools needed to make appropriate adjustments in the

national volume requirements to address" the blendwall, 2013 Rule at 49,823, and

in its NPRM for 2014, EPA confirmed that § 7545(o)(7)(A)(ii) allowed it to reduce

statutory volume requirements in light of "factors that constrain supplying those

volumes to the vehicles that can consume them."  2014 NPRM at 71,757; *id.* at

71,754-57.

Third, EPA could have eliminated the disproportionate impact of the

statutory volume requirements by choosing to place the compliance obligation on

blenders rather than on refiners and importers, as several commenters suggested.

*See* 2007 Rule at 23,925-27 (explaining that EPA has discretion under 42 U.S.C.

§7545(o)(3)(B)(ii)(I) to determine the parties on which the compliance obligation

should be imposed); JA414, 675 (comments suggesting change).  EPA already

acknowledged in 2010 that "the rationale … for placing the obligation on just the

upstream refiners and importers [was] no longer valid," 2010 Rule at 14,722, and it

pledged that it would "continue to evaluate the functionality of the RIN market."

*Id.*  If it "determine[d] that the RIN market is not operating as intended, driving up

prices for obligated parties and fuel prices for consumers," it promised to "consider

revisiting" its decision to make refiners and importers, rather than blenders, the

obligated parties.  *Id.*  Despite being confronted with precisely that evidence,

however, EPA left in place the regulation making refiners and importers the

obligated parties.

## III.    The 2013 Rule Must Be Vacated Due To EPA's Extreme Tardiness In Issuing It.

Congress mandated that EPA publish its final rule setting volume percentage

requirements by the November 30 prior to the year in which the rule would take

effect.  42 U.S.C. §7545(o)(3)(B)(i).  That timing requirement is critically

important to market participants, who cannot make informed business decisions

without knowing the extent of their compliance obligations.  EPA promulgated the

2013 Rule on August 15, 2013 – eight-and-a-half months late – yet it applied the

rule to transactions beginning January 1, 2013.

EPA's late issuance of 2013 Rule, and its retroactive application of the rule,

were unlawful.  *See  Sierra Club v. Whitman*, 285 F.3d 63, 68 (D.C. Cir. 2002).  To

be sure, this Court has previously upheld EPA's retroactive application of the 2010

23

Rule, which implemented RFS2 for the first time.  *See Nat'l Petrochem. & Refiners Ass'n v. EPA*, 630 F.3d 145, 150, 163 (D.C. Cir. 2010).  The Court stated there that "[t]he structure of the [statute] demonstrates that Congress anticipated the possibility of some retroactive impacts *in the first year* of the expanded renewable fuel program."  *Id.* at 163 (emphasis added).  This Court should not extend that holding to allow EPA to ignore Congress's statutory deadline for *annual* rulemakings by issuing a rule after the year is two-thirds over, and then to apply that rule retroactively.

Moreover, even if EPA had authority to ignore statutory deadlines and apply a rule retroactively, EPA still must exercise that authority in a reasonable manner. *Id.* at 162-63.  It failed to do so here.  EPA claimed retroactivity was justified because it must "ensure" that the annual statutory volumes are satisfied.  2013 Rule at 49,799.  But due to the blendwall, EPA itself acknowledged that those volumes could not be satisfied by renewable fuel used in 2013.  *Id.* at 49,821.  Moreover, because ethanol was cheaper than the petroleum blendstock, a RIN obligation was not needed to ensure the use of as much ethanol as possible.

EPA also claimed that "obligated parties have been provided reasonable notice that EPA would act in approximately the manner specified in the final rule." *Id.*  Yet EPA's NPRM requested comment on how EPA should address the blendwall.  JA35.  Parties had no reason to expect that EPA would impose a

volume requirement that exceeded the blendwall. Moreover, without notice, EPA calculated parties' percentage volume obligations using an updated, lower projection of total gasoline consumption, rather than the projection provided to EPA in Fall 2012, as the statute requires. *See* 42 U.S.C. §7545(o)(3)(A); 2013 Rule at 49,825 & n.76. That had the effect of increasing parties' percentage volume obligations in a manner that could not be anticipated, after two-thirds of the year had already passed. *See also* AFPM/API Br. at 15-19.

Finally, EPA asserted that "the parties have adequate lead time to comply" because "compliance is achieved by … purchasing … RINs." 2013 Rule at 49,800. Under that logic, EPA could have issued the 2013 Rule even after the year was over, and parties would not be harmed. In fact, the statutory deadline is critically important to market participants, who need to know the volume percentage requirements to make informed business decisions that will affect their ultimate compliance obligations. For example, refiners must decide whether to reduce production of blendstock in order to minimize compliance obligations. At the margin, the cost of compliance could exceed the benefits of additional production. Refiners also must decide whether to sell blendstock domestically (which results in a compliance obligation) or export it (which does not result in any obligation). *See, e.g.*, JA488, 672. EPA entirely failed to take these factors into

account in deciding to apply its rule retroactively, and for that reason, too, the 2013

Rule is arbitrary and capricious.

## CONCLUSION

The 2013 Rule should be vacated.  Petitioner respectfully requests that the

Court render a decision by April 30, 2014, to allow Monroe and other obligated

parties sufficient time to acquire RINs following this Court's decision but in

advance of the June 30, 2014, compliance deadline.

Dated: December 9, 2013                    Respectfully submitted,

  /s/ David W. DeBruin

David W. DeBruin
Marc A. Goldman
Matthew E. Price
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
Phone:  (202) 639-6015
Fax:  (202) 639-6066
Email:  ddebruin@jenner.com
       mgoldman@jenner.com
       mprice@jenner.com

*Counsel for Monroe Energy, LLC*

26

## RULE 32(a)(7) CERTIFICATE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,000 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman and 14 point font.


December 9, 2013                              /s/  David W. DeBruin

                                             David W. DeBruin

27

## CERTIFICATE OF SERVICE

I hereby certify that, on this 9th day of December, 2013, a copy of the

foregoing **Brief of Petitioner Monroe Energy, LLC** was served electronically

through the Court's CM/ECF system on:

Robert Allen Long, Jr.
Kristen Elizabeth Eichensehr
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401

Harry Moy Ng, Esq.
American Petroleum Institute
1220 L Street, NW  Suite 900
Washington, DC 20005-4070

Chet Maraffa Thompson, Esquire
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595

Richard S. Moskowitz, General Counsel
American Fuel & Petrochemical
Manufacturers
1667 K Street, NW Suite 700
Washington, DC 20006

Jessica O'Donnell, Esq.
Brian H. Lynk
U.S. Department of Justice
Environment and Natural Resources
Division
601 D Street, NW, Suite 8000
Washington, D.C. 20004

Bart E. Cassidy
Katherine L. Vaccaro,
Manko, Gold, Katcher & Fox, LLP
401 City Avenue Suite 500
Bala Cynwyd, PA 19004

John Caviness O'Quinn
William H. Burgess
Kirkland & Ellis LLP
655 15th Street, NW Suite 1200
Washington, DC 20005

Sandra Patricia Franco
Bryan Michael Killian
Bingham McCutchen LLP
2020 K Street, NW
Washington, DC 20006-1806

Dated:  December 9, 2013

/s/ David W. DeBruin
David W. DeBruin

28

# STATUTORY AND REGULATORY ADDENDUM

## STATUTORY AND REGULATORY ADDENDUM
## TABLE OF CONTENTS

42 U.S.C. §7545(o) ........................................................................ Add. 1

40 C.F.R. §80.1405 ...................................................................... Add. 20

40 C.F.R. §80.1406 ...................................................................... Add. 20

40 C.F.R. §80.1451 ...................................................................... Add. 22

# 42 U.S.C. §7545(o)

(o) Renewable fuel program.

  (1) Definitions. In this section:

   (A) Additional renewable fuel. The term "additional renewable fuel" means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in home heating oil or jet fuel.

   (B) Advanced biofuel.

      (i) In general. The term "advanced biofuel" means renewable fuel, other than ethanol derived from corn starch, that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than baseline lifecycle greenhouse gas emissions.

      (ii) Inclusions. The types of fuels eligible for consideration as "advanced biofuel" may include any of the following:

         (I) Ethanol derived from cellulose, hemicellulose, or lignin.

         (II) Ethanol derived from sugar or starch (other than corn starch).

         (III) Ethanol derived from waste material, including crop residue, other vegetative waste material, animal waste, and food waste and yard waste.

         (IV) Biomass-based diesel.

         (V) Biogas (including landfill gas and sewage waste treatment gas) produced through the conversion of organic matter from renewable biomass.

         (VI) Butanol or other alcohols produced through the conversion of organic matter from renewable biomass.

         (VII) Other fuel derived from cellulosic biomass.

   (C) Baseline lifecycle greenhouse gas emissions. The term "baseline lifecycle greenhouse gas emissions" means the average lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, for

gasoline or diesel (whichever is being replaced by the renewable fuel) sold or distributed as transportation fuel in 2005.

(D) Biomass-based diesel. The term "biomass-based diesel" means renewable fuel that is biodiesel as defined in section 312(f) of the Energy Policy Act of 1992 (*42 U.S.C. 13220(f)*) and that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than the baseline lifecycle greenhouse gas emissions. Notwithstanding the preceding sentence, renewable fuel derived from co-processing biomass with a petroleum feedstock shall be advanced biofuel if it meets the requirements of subparagraph (B), but is not biomass-based diesel.

(E) Cellulosic biofuel. The term "cellulosic biofuel" means renewable fuel derived from any cellulose, hemicellulose, or lignin that is derived from renewable biomass and that has lifecycle greenhouse gas emissions, as determined by the Administrator, that are at least 60 percent less than the baseline lifecycle greenhouse gas emissions.

(F) Conventional biofuel. The term "conventional biofuel" means renewable fuel that is ethanol derived from corn starch.

(G) Greenhouse gas. The term "greenhouse gas" means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, sulfur hexafluoride. The Administrator may include any other anthropogenically-emitted gas that is determined by the Administrator, after notice and comment, to contribute to global warming.

(H) Lifecycle greenhouse gas emissions. The term "lifecycle greenhouse gas emissions" means the aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Administrator, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential.

(I) Renewable biomass. The term "renewable biomass" means each of the following:

Add. 2

(i) Planted crops and crop residue harvested from agricultural land cleared or cultivated at any time prior to the enactment of this sentence that is either actively managed or fallow, and nonforested.

(ii) Planted trees and tree residue from actively managed tree plantations on non-federal land cleared at any time prior to enactment of this sentence, including land belonging to an Indian tribe or an Indian individual, that is held in trust by the United States or subject to a restriction against alienation imposed by the United States.

(iii) Animal waste material and animal byproducts.

(iv) Slash and pre-commercial thinnings that are from non-federal forestlands, including forestlands belonging to an Indian tribe or an Indian individual, that are held in trust by the United States or subject to a restriction against alienation imposed by the United States, but not forests or forestlands that are ecological communities with a global or State ranking of critically imperiled, imperiled, or rare pursuant to a State Natural Heritage Program, old growth forest, or late successional forest.

(v) Biomass obtained from the immediate vicinity of buildings and other areas regularly occupied by people, or of public infrastructure, at risk from wildfire.

(vi) Algae.

(vii) Separated yard waste or food waste, including recycled cooking and trap grease.

(J) Renewable fuel. The term "renewable fuel" means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in a transportation fuel.

(K) Small refinery. The term "small refinery" means a refinery for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels.

(L) Transportation fuel. The term "transportation fuel" means fuel for use in motor vehicles, motor vehicle engines, nonroad vehicles, or nonroad engines (except for ocean-going vessels).

(2) Renewable fuel program.

(A) Regulations.

(i) In general. Not later than 1 year after the date of enactment of this paragraph [enacted Aug. 8, 2005], the Administrator shall promulgate regulations to ensure that gasoline sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains the applicable volume of renewable fuel determined in accordance with subparagraph (B). Not later than 1 year after the date of enactment of this sentence [enacted Dec. 19, 2007], the Administrator shall revise the regulations under this paragraph to ensure that transportation fuel sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains at least the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel, determined in accordance with subparagraph (B) and, in the case of any such renewable fuel produced from new facilities that commence construction after the date of enactment of this sentence, achieves at least a 20 percent reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle greenhouse gas emissions.

(ii) Noncontiguous State opt-in.

(I) In general. On the petition of a noncontiguous State or territory, the Administrator may allow the renewable fuel program established under this subsection to apply in the noncontiguous State or territory at the same time or any time after the Administrator promulgates regulations under this subparagraph.

(II) Other actions. In carrying out this clause, the Administrator may—

(aa) issue or revise regulations under this paragraph;

(bb) establish applicable percentages under paragraph (3);

(cc) provide for the generation of credits under paragraph (5); and

Add. 4

(dd) take such other actions as are necessary to allow for the application of the renewable fuels program in a noncontiguous State or territory.

(iii) Provisions of regulations. Regardless of the date of promulgation, the regulations promulgated under clause (i)—

(I) shall contain compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate, to ensure that the requirements of this paragraph are met; but

(II) shall not—

(aa) restrict geographic areas in which renewable fuel may be used; or

(bb) impose any per-gallon obligation for the use of renewable fuel.

(iv) Requirement in case of failure to promulgate regulations. If the Administrator does not promulgate regulations under clause (i), the percentage of renewable fuel in gasoline sold or dispensed to consumers in the United States, on a volume basis, shall be 2.78 percent for calendar year 2006.

(B) Applicable volumes.

(i) Calendar years after 2005.

(I) Renewable fuel. For the purpose of subparagraph (A), the applicable
volume of renewable fuel for the calendar years 2006 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of renewable fuel (in billions of gallons): |
|---|---|
| 2006 | 4.0 |
| 2007 | 4.7 |
| 2008 | 9.0 |

Add. 5

| | |
|---|---|
| 2009 | 11.1 |
| 2010 | 12.95 |
| 2011 | 13.95 |
| 2012 | 15.2 |
| 2013 | 16.55 |
| 2014 | 18.15 |
| 2015 | 20.5 |
| 2016 | 22.25 |
| 2017 | 24.0 |
| 2018 | 26.0 |
| 2019 | 28.0 |
| 2020 | 30.0 |
| 2021 | 33.0 |
| 2022 | 36.0 |

(II) Advanced biofuel. For the purpose of subparagraph (A), of the volume of renewable fuel required under subclause (I), the applicable volume of advanced biofuel for the calendar years 2009 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of advanced biofuel (in billions of gallons): |
|---|---|
| 2009 | 0.6 |

Add. 6

| | |
|---|---|
| 2010 | 0.95 |
| 2011 | 1.35 |
| 2012 | 2.0 |
| 2013 | 2.75 |
| 2014 | 3.75 |
| 2015 | 5.5 |
| 2016 | 7.25 |
| 2017 | 9.0 |
| 2018 | 11.0 |
| 2019 | 13.0 |
| 2020 | 15.0 |
| 2021 | 18.0 |
| 2022 | 21.0 |

(III) Cellulosic biofuel. For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of cellulosic biofuel for the calendar years 2010 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of cellulosic biofuel (in billions of gallons): |
|---|---|
| 2010 | 0.1 |
| 2011 | 0.25 |
| 2012 | 0.5 |

Add. 7

| | |
|---|---|
| 2013 | 1.0 |
| 2014 | 1.75 |
| 2015 | 3.0 |
| 2016 | 4.25 |
| 2017 | 5.5 |
| 2018 | 7.0 |
| 2019 | 8.5 |
| 2020 | 10.5 |
| 2021 | 13.5 |
| 2022 | 16.0 |

(IV) Biomass-based diesel. For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of biomass-based diesel for the calendar years 2009 through 2012 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of biomass-based diesel (in billions of gallons): |
|---|---|
| 2009 | 0.5 |
| 2010 | 0.65 |
| 2011 | 0.80 |
| 2012 | 1.0 |

(ii) Other calendar years. For the purposes of subparagraph (A), the applicable volumes of each fuel specified in the tables in clause (i) for calendar

Add. 8

years after the calendar years specified in the tables shall be determined by the Administrator, in coordination with the Secretary of Energy and the Secretary of Agriculture, based on a review of the implementation of the program during calendar years specified in the tables, and an analysis of—

(I) the impact of the production and use of renewable fuels on the environment, including on air quality, climate change, conversion of wetlands, ecosystems, wildlife habitat, water quality, and water supply;

(II) the impact of renewable fuels on the energy security of the United States;

(III) the expected annual rate of future commercial production of renewable fuels, including advanced biofuels in each category (cellulosic biofuel and biomass-based diesel);

(IV) the impact of renewable fuels on the infrastructure of the United States, including deliverability of materials, goods, and products other than renewable fuel, and the sufficiency of infrastructure to deliver and use renewable fuel;

(V) the impact of the use of renewable fuels on the cost to consumers of transportation fuel and on the cost to transport goods; and

(VI) the impact of the use of renewable fuels on other factors, including job creation, the price and supply of agricultural commodities, rural economic development, and food prices.

The Administrator shall promulgate rules establishing the applicable volumes under this clause no later than 14 months before the first year for which such applicable volume will apply.

(iii) Applicable volume of advanced biofuel. For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of advanced biofuel shall be at least the same percentage of the applicable volume of renewable fuel as in calendar year 2022.

(iv) Applicable volume of cellulosic biofuel. For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of cellulosic biofuel established by the Administrator shall be based on the

Add. 9

assumption that the Administrator will not need to issue a waiver for such years under paragraph (7)(D).

(v) Minimum applicable volume of biomass-based diesel. For the purpose of making the determinations in clause (ii), the applicable volume of biomass-based diesel shall not be less than the applicable volume listed in clause (i)(IV) for calendar year 2012.

(3) Applicable percentages.

(A) Provision of estimate of volumes of gasoline sales. Not later than October 31 of each of calendar years 2005 through 2021, the Administrator of the Energy Information Administration shall provide to the Administrator of the Environmental Protection Agency an estimate, with respect to the following calendar year, of the volumes of transportation fuel, biomass-based diesel, and cellulosic biofuel projected to be sold or introduced into commerce in the United States.

(B) Determination of applicable percentages.

(i) In general. Not later than November 30 of each of calendar years 2005 through 2021, based on the estimate provided under subparagraph (A), the Administrator of the Environmental Protection Agency shall determine and publish in the Federal Register, with respect to the following calendar year, the renewable fuel obligation that ensures that the requirements of paragraph (2) are met.

(ii) Required elements. The renewable fuel obligation determined for a calendar year under clause (i) shall—

(I) be applicable to refineries, blenders, and importers, as appropriate;

(II) be expressed in terms of a volume percentage of transportation fuel sold or introduced into commerce in the United States; and

(III) subject to subparagraph (C)(i), consist of a single applicable percentage that applies to all categories of persons specified in subclause (I).

(C) Adjustments. In determining the applicable percentage for a calendar year, the Administrator shall make adjustments—

Add. 10

(i) to prevent the imposition of redundant obligations on any person specified in subparagraph (B)(ii)(I); and

(ii) to account for the use of renewable fuel during the previous calendar year by small refineries that are exempt under paragraph (9).

(4) Modification of greenhouse gas reduction percentages.

(A) In general. The Administrator may, in the regulations under the last sentence of paragraph (2)(A)(i), adjust the 20 percent, 50 percent, and 60 percent reductions in lifecycle greenhouse gas emissions specified in paragraphs (2)(A)(i) (relating to renewable fuel), (1)(D) (relating to biomass-based diesel), (1)(B)(i) (relating to advanced biofuel), and (1)(E) (relating to cellulosic biofuel) to a lower percentage. For the 50 and 60 percent reductions, the Administrator may make such an adjustment only if he determines that generally such reduction is not commercially feasible for fuels made using a variety of feedstocks, technologies, and processes to meet the applicable reduction.

(B) Amount of adjustment. In promulgating regulations under this paragraph, the specified 50 percent reduction in greenhouse gas emissions from advanced biofuel and in biomass-based diesel may not be reduced below 40 percent. The specified 20 percent reduction in greenhouse gas emissions from renewable fuel may not be reduced below 10 percent, and the specified 60 percent reduction in greenhouse gas emissions from cellulosic biofuel may not be reduced below 50 percent.

(C) Adjusted reduction levels. An adjustment under this paragraph to a percent less than the specified 20 percent greenhouse gas reduction for renewable fuel shall be the minimum possible adjustment, and the adjusted greenhouse gas reduction shall be established by the Administrator at the maximum achievable level, taking cost in consideration, for natural gas fired corn-based ethanol plants, allowing for the use of a variety of technologies and processes. An adjustment in the 50 or 60 percent greenhouse gas levels shall be the minimum possible adjustment for the fuel or fuels concerned, and the adjusted greenhouse gas reduction shall be established at the maximum achievable level, taking cost in consideration, allowing for the use of a variety of feedstocks, technologies, and processes.

(D) 5-year review. Whenever the Administrator makes any adjustment under this paragraph, not later than 5 years thereafter he shall review and revise (based

Add. 11

upon the same criteria and standards as required for the initial adjustment) the regulations establishing the adjusted level.

(E) Subsequent adjustments. After the Administrator has promulgated a final rule under the last sentence of paragraph (2)(A)(i) with respect to the method of determining lifecycle greenhouse gas emissions, except as provided in subparagraph (D), the Administrator may not adjust the percent greenhouse gas reduction levels unless he determines that there has been a significant change in the analytical methodology used for determining the lifecycle greenhouse gas emissions. If he makes such determination, he may adjust the 20, 50, or 60 percent reduction levels through rulemaking using the criteria and standards set forth in this paragraph.

(F) Limit on upward adjustments. If, under subparagraph (D) or (E), the Administrator revises a percent level adjusted as provided in subparagraphs (A), (B), and (C) to a higher percent, such higher percent may not exceed the applicable percent specified in paragraph (2)(A)(i), (1)(D), (1)(B)(i), or (1)(E).

(G) Applicability of adjustments. If the Administrator adjusts, or revises, a percent level referred to in this paragraph or makes a change in the analytical methodology used for determining the lifecycle greenhouse gas emissions, such adjustment, revision, or change (or any combination thereof) shall only apply to renewable fuel from new facilities that commence construction after the effective date of such adjustment, revision, or change.

(5) Credit program.

(A) In general. The regulations promulgated under paragraph (2)(A) shall provide—

(i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required under paragraph (2);

(ii) for the generation of an appropriate amount of credits for biodiesel; and

(iii) for the generation of credits by small refineries in accordance with paragraph (9)(C).

(B) Use of credits. A person that generates credits under subparagraph (A) may use the credits, or transfer all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

(C) Duration of credits. A credit generated under this paragraph shall be valid to show compliance for the 12 months as of the date of generation.

(D) Inability to generate or purchase sufficient credits. The regulations promulgated under paragraph (2)(A) shall include provisions allowing any person that is unable to generate or purchase sufficient credits to meet the requirements of paragraph (2) to carry forward a renewable fuel deficit on condition that the person, in the calendar year following the year in which the renewable fuel deficit is created—

(i) achieves compliance with the renewable fuel requirement under paragraph (2); and

(ii) generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year.

(E) Credits for additional renewable fuel. The Administrator may issue regulations providing: (i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports additional renewable fuels specified by the Administrator; and (ii) for the use of such credits by the generator, or the transfer of all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

(6) Seasonal variations in renewable fuel use.

(A) Study. For each of calendar years 2006 through 2012, the Administrator of the Energy Information Administration shall conduct a study of renewable fuel blending to determine whether there are excessive seasonal variations in the use of renewable fuel.

(B) Regulation of excessive seasonal variations. If, for any calendar year, the Administrator of the Energy Information Administration, based on the study under subparagraph (A), makes the determinations specified in subparagraph (C), the Administrator of the Environmental Protection Agency shall promulgate regulations to ensure that 25 percent or more of the quantity of renewable fuel

necessary to meet the requirements of paragraph (2) is used during each of the 2 periods specified in subparagraph (D) of each subsequent calendar year.

(C) Determinations. The determinations referred to in subparagraph (B) are that—

(i) less than 25 percent of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) has been used during 1 of the 2 periods specified in subparagraph (D) of the calendar year;

(ii) a pattern of excessive seasonal variation described in clause (i) will continue in subsequent calendar years; and

(iii) promulgating regulations or other requirements to impose a 25 percent or more seasonal use of renewable fuels will not prevent or interfere with the attainment of national ambient air quality standards or significantly increase the price of motor fuels to the consumer.

(D) Periods. The 2 periods referred to in this paragraph are—

(i) April through September; and

(ii) January through March and October through December.

(E) Exclusion. Renewable fuel blended or consumed in calendar year 2006 in a State that has received a waiver under section 209(b) shall not be included in the study under subparagraph (A).

(F) State exemption from seasonality requirements. Notwithstanding any other provision of law, the seasonality requirement relating to renewable fuel use established by this paragraph shall not apply to any State that has received a waiver under section 209(b) or any State dependent on refineries in such State for gasoline supplies.

(7) Waivers.

(A) In general. The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, may waive the requirements of paragraph (2) in whole or in part on petition by one or more States, by any person subject to

the requirements of this subsection, or by the Administrator on his own motion by reducing the national quantity of renewable fuel required under paragraph (2)—

 (i) based on a determination by the Administrator, after public notice and opportunity for comment, that implementation of the requirement would severely harm the economy or environment of a State, a region, or the United States; or

 (ii) based on a determination by the Administrator, after public notice and opportunity for comment, that there is an inadequate domestic supply.

 (B) Petitions for waivers. The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, shall approve or disapprove a petition for a waiver of the requirements of paragraph (2) within 90 days after the date on which the petition is received by the Administrator.

 (C) Termination of waivers. A waiver granted under subparagraph (A) shall terminate after 1 year, but may be renewed by the Administrator after consultation with the Secretary of Agriculture and the Secretary of Energy.

 (D) Cellulosic biofuel.

 (i) For any calendar year for which the projected volume of cellulosic biofuel production is less than the minimum applicable volume established under paragraph (2)(B), as determined by the Administrator based on the estimate provided under paragraph (3)(A), not later than November 30 of the preceding calendar year, the Administrator shall reduce the applicable volume of cellulosic biofuel required under paragraph (2)(B) to the projected volume available during that calendar year. For any calendar year in which the Administrator makes such a reduction, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

 (ii) Whenever the Administrator reduces the minimum cellulosic biofuel volume under this subparagraph, the Administrator shall make available for sale cellulosic biofuel credits at the higher of $ 0.25 per gallon or the amount by which $ 3.00 per gallon exceeds the average wholesale price of a gallon of gasoline in the United States. Such amounts shall be adjusted for inflation by the Administrator for years after 2008.

(iii) Eighteen months after the date of enactment of this subparagraph, the Administrator shall promulgate regulations to govern the issuance of credits under this subparagraph. The regulations shall set forth the method for determining the exact price of credits in the event of a waiver. The price of such credits shall not be changed more frequently than once each quarter. These regulations shall include such provisions, including limiting the credits' uses and useful life, as the Administrator deems appropriate to assist market liquidity and transparency, to provide appropriate certainty for regulated entities and renewable fuel producers, and to limit any potential misuse of cellulosic biofuel credits to reduce the use of other renewable fuels, and for such other purposes as the Administrator determines will help achieve the goals of this subsection. The regulations shall limit the number of cellulosic biofuel credits for any calendar year to the minimum applicable volume (as reduced under this subparagraph) of cellulosic biofuel for that year.

(E) Biomass-based diesel.

(i) Market evaluation. The Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall periodically evaluate the impact of the biomass-based diesel requirements established under this paragraph on the price of diesel fuel.

(ii) Waiver. If the Administrator determines that there is a significant renewable feedstock disruption or other market circumstances that would make the price of biomass-based diesel fuel increase significantly, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall issue an order to reduce, for up to a 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed 15 percent of the applicable annual requirement for biomass-based diesel. For any calendar year in which the Administrator makes a reduction under this subparagraph, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

(iii) Extensions. If the Administrator determines that the feedstock disruption or circumstances described in clause (ii) is continuing beyond the 60-day period described in clause (ii) or this clause, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, may issue an order to reduce, for up to an additional 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed an

Add. 16

additional 15 percent of the applicable annual requirement for biomass-based diesel.

(F) Modification of applicable volumes. For any of the tables in paragraph (2)(B), if the Administrator waives—

(i) at least 20 percent of the applicable volume requirement set forth in any such table for 2 consecutive years; or

(ii) at least 50 percent of such volume requirement for a single year,

the Administrator shall promulgate a rule (within 1 year after issuing such waiver) that modifies the applicable volumes set forth in the table concerned for all years following the final year to which the waiver applies, except that no such modification in applicable volumes shall be made for any year before 2016. In promulgating such a rule, the Administrator shall comply with the processes, criteria, and standards set forth in paragraph (2)(B)(ii).

(8) Study and waiver for initial year of program.

(A) In general. Not later than 180 days after the date of enactment of this paragraph [enacted Aug. 8, 2005], the Secretary of Energy shall conduct for the Administrator a study assessing whether the renewable fuel requirement under paragraph (2) will likely result in significant adverse impacts on consumers in 2006, on a national, regional, or State basis.

(B) Required evaluations. The study shall evaluate renewable fuel—

(i) supplies and prices;

(ii) blendstock supplies; and

(iii) supply and distribution system capabilities.

(C) Recommendations by the Secretary. Based on the results of the study, the Secretary of Energy shall make specific recommendations to the Administrator concerning waiver of the requirements of paragraph (2), in whole or in part, to prevent any adverse impacts described in subparagraph (A).

(D) Waiver.

(i) In general. Not later than 270 days after the date of enactment of this paragraph [enacted Aug. 8, 2005], the Administrator shall, if and to the extent recommended by the Secretary of Energy under subparagraph (C), waive, in whole or in part, the renewable fuel requirement under paragraph (2) by reducing the national quantity of renewable fuel required under paragraph (2) in calendar year 2006.

(ii) No effect on waiver authority. Clause (i) does not limit the authority of the Administrator to waive the requirements of paragraph (2) in whole, or in part, under paragraph (7).

(9) Small refineries.

(A) Temporary exemption.

(i) In general. The requirements of paragraph (2) shall not apply to small refineries until calendar year 2011.

(ii) Extension of exemption.

(I) Study by Secretary of Energy. Not later than December 31, 2008, the Secretary of Energy shall conduct for the Administrator a study to determine whether compliance with the requirements of paragraph (2) would impose a disproportionate economic hardship on small refineries.

(II) Extension of exemption. In the case of a small refinery that the Secretary of Energy determines under subclause (I) would be subject to a disproportionate economic hardship if required to comply with paragraph (2), the Administrator shall extend the exemption under clause (i) for the small refinery for a period of not less than 2 additional years.

(B) Petitions based on disproportionate economic hardship.

(i) Extension of exemption. A small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship.

(ii) Evaluation of petitions. In evaluating a petition under clause (i), the Administrator, in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors.

(iii) Deadline for action on petitions. The Administrator shall act on any petition submitted by a small refinery for a hardship exemption not later than 90 days after the date of receipt of the petition.

(C) Credit program. If a small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A), the regulations promulgated under paragraph (2)(A) shall provide for the generation of credits by the small refinery under paragraph (5) beginning in the calendar year following the date of notification.

(D) Opt-in for small refineries. A small refinery shall be subject to the requirements of paragraph (2) if the small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A).

(10) Ethanol market concentration analysis.

(A) Analysis.

(i) In general. Not later than 180 days after the date of enactment of this paragraph [enacted Aug. 8, 2005], and annually thereafter, the Federal Trade Commission shall perform a market concentration analysis of the ethanol production industry using the Herfindahl-Hirschman Index to determine whether there is sufficient competition among industry participants to avoid price-setting and other anticompetitive behavior.

(ii) Scoring. For the purpose of scoring under clause (i) using the Herfindahl-Hirschman Index, all marketing arrangements among industry participants shall be considered.

(B) Report. Not later than December 1, 2005, and annually thereafter, the Federal Trade Commission shall submit to Congress and the Administrator a report on the results of the market concentration analysis performed under subparagraph (A)(i).

(11) Periodic reviews. To allow for the appropriate adjustment of the requirements described in subparagraph (B) of paragraph (2), the Administrator shall conduct periodic reviews of—

(A) existing technologies;

(B) the feasibility of achieving compliance with the requirements; and

(C) the impacts of the requirements described in subsection (a)(2) on each individual and entity described in paragraph (2).

(12) Effect on other provisions. Nothing in this subsection, or regulations issued pursuant to this subsection, shall affect or be construed to affect the regulatory status of carbon dioxide or any other greenhouse gas, or to expand or limit regulatory authority regarding carbon dioxide or any other greenhouse gas, for purposes of other provisions (including section 165 [42 USCS § 7475]) of this Act. The previous sentence shall not affect implementation and enforcement of this subsection.

## 40 C.F.R. §80.1405

§ 80.1405 What are the Renewable Fuel Standards?

(a) * * *

(4) *Renewable Fuel Standards for 2013.*

(i) The value of the cellulosic biofuel standard for 2013 shall be 0.004 percent.

(ii) The value of the biomass-based diesel standard for 2013 shall be 1.13 percent.

(iii) The value of the advanced biofuel standard for 2013 shall be 1.62 percent.

(iv) The value of the renewable fuel standard for 2013 shall be 9.74 percent.

* * *

## 40 C.F.R. §80.1406

§80.1406   Who is an obligated party under the RFS program?

(a)(1) An obligated party is any refiner that produces gasoline or diesel fuel within the 48 contiguous states or Hawaii, or any importer that imports gasoline or diesel fuel into the 48 contiguous states or Hawaii during a compliance period. A party

that simply blends renewable fuel into gasoline or diesel fuel, as defined in §80.1407(c) or (e), is not an obligated party.

(2) If the Administrator approves a petition of Alaska or a United States territory to opt-in to the renewable fuel program under the provisions in §80.1443, then "obligated party" shall also include any refiner that produces gasoline or diesel fuel within that state or territory, or any importer that imports gasoline or diesel fuel into that state or territory.

(b) For each compliance period starting with 2010, an obligated party is required to demonstrate, pursuant to §80.1427, that it has satisfied the Renewable Volume Obligations for that compliance period, as specified in §80.1407(a).

(c) Aggregation of facilities—(1) Except as provided in paragraphs (c)(2), (d) and (e) of this section, an obligated party may comply with the requirements of paragraph (b) of this section in the aggregate for all of the refineries that it operates, or for each refinery individually.

(2) An obligated party that carries a deficit into year i+1 must use the same approach to aggregation of facilities in year i+1 as it did in year i.

(d) An obligated party must comply with the requirements of paragraph (b) of this section for all of its imported gasoline or diesel fuel in the aggregate.

(e) An obligated party that is both a refiner and importer must comply with the requirements of paragraph (b) of this section for its imported gasoline or diesel fuel separately from gasoline or diesel fuel produced by its domestic refinery or refineries.

(f) Where a refinery or import facility is jointly owned by two or more parties, the requirements of paragraph (b) of this section may be met by one of the joint owners for all of the gasoline or diesel fuel produced/imported at the facility, or each party may meet the requirements of paragraph (b) of this section for the portion of the gasoline or diesel fuel that it produces or imports, as long as all of the gasoline or diesel fuel produced/imported at the facility is accounted for in determining the Renewable Volume Obligations under §80.1407. In either case, all joint owners are subject to the liability provisions of §80.1461(d).

Add. 21

(g) The requirements in paragraph (b) of this section apply to the following compliance periods: Beginning in 2010, and every year thereafter, the compliance period is January 1 through December 31.


**40 C.F.R. §80.1451**


§ 80.1451 What are the reporting requirements under the RFS program?

(a) * * *

(1) Annual compliance reports for the previous compliance period shall be submitted by February 28 of each year except as provided in paragraph (xiv) below, and shall include all of the following information:


* * *


(xiv) For the 2013 compliance year, annual compliance reports shall be submitted by June 30, 2014.